```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3   DANYAL SHAIKH             )      NO. 4:16-CV-591
                              )
 4                            )
     VS.                      )      Houston, Texas
 5                            )      9:14 a.m.
                              )
 6   TEXAS A&M COLLEGE OF      )      June 6, 2016
     MEDICINE, ET AL          )
 7

 8
        ********************************************************
 9
                             HEARING
10
             BEFORE THE HONORABLE LYNN N. HUGHES
11
                UNITED STATES DISTRICT JUDGE
12
        ********************************************************
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:

16        Mr. Donald G. Henlsee
          Law Office of Donald G. Henslee
17        901 Mopac Expressway South, Suite 300
          Austin, TX 78746
18        Tel:  512-320-9177

19   FOR THE DEFENDANT:

20        Mr. Eric Alan Hudson
          Texas Attorney General
21        300 W. 15th St.
          Austin, TX 78711
22        Tel:  512-463-2120

23        Mr. Joe Galvan
          Office of General Counsel
24        Texas A&M University System

25
```

1  COURT REPORTER:

2        Ms. Kathleen K. Miller, CSR, RMR, CRR
         515 Rusk, Room 8004
3        Houston, Texas  77002
         Tel:  713-250-5087
4
   Proceedings recorded by mechanical stenography.
5
   Transcript produced by computer-assisted transcription.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. HUDSON:  Good morning, Your Honor, my

2  apologies, I was sitting in the courtroom.  I wasn't

3  aware --

4          THE COURT:  Tell me about this person you

09:14:40  5  brought with you.

6          MR. HUDSON:  Joe Galvan, he's general counsel

7  with the A&M System.  He is my client contact.

8          THE COURT:  Does he wear socks like those?

9          MR. HUDSON:  No, sir.  Only -- only us fancy

09:14:53  10  lawyers up in Austin do, sir.

11          THE COURT:  He is the general counsel of what

12  exactly?

13          MR. HUDSON:  Of Texas A&M System.

14          THE COURT:  The whole thing?

09:15:03  15          MR. HUDSON:  No, not the whole thing, Your

16  Honor.  He's assistant general counsel.

17          THE COURT:  Well, he's got some kind of

18  assignment, for sports injuries, or --

19          MR. HUDSON:  I believe he does, for lack of a

09:15:16  20  better phrase, a general practice there with the A&M

21  System, but his specialty, as I understand it, is

22  with areas involving medical claims.

23          THE COURT:  All right.  Go get him.

24          MR. HUDSON:  Yes, sir.

09:15:30  25          THE COURT:  Good morning, Mr. Galvan.

1          MR. GALVAN:   Joe Galvan.

2          THE COURT:   Sorry about the glitch.   We thought

3  you were just an ordinary bureaucrat.   You're worse.

4  You're a bureaucrat with a law degree, which I guess to a

09:17:01  5  large extent so am I.

6              All right.   Mr.  Henslee.

7          MR. HENSLEE:   Yes, sir.

8          THE COURT:   Do they have Mr. Shaikh --

9          MR. HENSLEE:   Shaikh.

09:17:19  10          THE COURT:   Shaikh.   Do they have his medical

11  records through all -- all of his medical records through

12  all of this, and antecedent to?   So he is about 25 or so?

13          MR. HENSLEE:   He's a little older than that

14  now.   I think he is 28.

09:17:38  15          THE COURT:   Okay.   So, let's have him give you

16  a list of every doctor he's seen, and I want -- the word

17  "doctor" includes priests, faith healers, gurus, anybody

18  he's gone to, the psychologists who aren't real, family

19  therapists, anybody from whom he has ever sought medical

09:18:17  20  care in that broad sense.

21          MR. HENSLEE:   Sure.

22          THE COURT:   Mental, physical.   The year, for

23  what, who the doctor was, if he remembers.   He can probably

24  remember where, of course, he is not that old.   He doesn't

09:18:35  25  have a lot to remember like mature and responsible people.

1                    Because even though there was a tumor, we
2  have no idea what the ground state was.
3                    What is he doing for a living now?
4              MR. HENSLEE:  He is -- he's doing some lab
09:19:02  5  work.
6              THE COURT:  For whom?
7              MR. HENSLEE:  You know, I don't know the name
8  of the company he is doing lab work for.
9              THE COURT:  We need his entire employment
09:19:10  10 history and that includes academic history.
11             MR. HENSLEE:  Yes, sir.
12             THE COURT:  So if the he is a full-time student
13 somewhere at some point for the last -- since he got out of
14 high school.
09:19:20  15             MR. HENSLEE:  Yes, sir.
16             THE COURT:  And he needs to keep a record of
17 every place he -- reconstruct it, if he hasn't done it,
18 every place he has applied for academic performance or
19 employment.
09:19:53  20                    It's my understanding for the disability,
21 the only legitimate defendant would be the university, the
22 employer, the school.
23             MR. HENSLEE:  Yes, sir.
24             THE COURT:  Not this fellow Young.  What does
09:20:15  25 he do there?

1          MR. GALVAN:  He's the president.

2          THE COURT:  Speak up.

3          MR. GALVAN:  He is the president, Texas A&M.

4          THE COURT:  This is not some cloistered

09:20:22  5 academic environment where everybody speaks in whispers

6 less they be held accountable for something.

7          She's got to hear.  Don't put this on the

8 record.

9          (Discussion off the record.)

09:21:02 10          THE COURT:  We can go back on the record.  So,

11 we also will need some detailed background on all these

12 people of yours who are mentioned in the complaint.  Is

13 there some student health service people?  Whoever these

14 people were, psychologists, or counselors, or whatever, get

09:21:48 15 their -- show you -- I want the curriculum vitae.

16          MR. HUDSON:  Yes, Your Honor.

17          THE COURT:  Which is probably not good Latin

18 pronunciation.

19          MR. HUDSON:  I understand what you're getting

09:21:56 20 at, Your Honor.

21          THE COURT:  I don't know why using "resume" is

22 not enough, except maybe it's a French word and people

23 don't want to use it.  So we can just call it their brief

24 autobiography.

09:22:10 25          MR. HUDSON:  Yes, sir, we will get that.

1          THE COURT:  With no comment about the case.  We

2  just need to have the data.

3          Mr. Galvan, the hard part of cases is the

4  facts, not the law.  You can look the law up.  I can't go

09:22:30  5  look up what happened at A&M, whenever this was.

6          Now, in paragraph 19, you say, on the step

7  one, on November 29th, 2012, did not pass due to the

8  ongoing and undiagnosed health challenges.  Actually, he

9  didn't pass because he didn't make a passing score.  In the

09:22:56  10  time allotted --

11          MR. HENSLEE:  Yes, sir.

12          THE COURT:  -- he did not answer the questions

13  correctly.  He assumes that it was because of his health.

14          MR. HENSLEE:  Yes, sir.

09:23:07  15          THE COURT:  Just make sure of that.

16          In 2012, he would have been 25 or six,

17  somewhere in there?

18          MR. HENSLEE:  That's about right.

19          THE COURT:  Okay.  The scary thing is that all

09:23:35  20  these students at A&M are presumptively adults.

21  Frightening, isn't it?

22          MR. HENSLEE:  Yes.

23          THE COURT:  And I -- not just A&M, all of them.

24  I have a U.T. degree.  I didn't know any better at the

09:23:55  25  time, but I'll just tell you I am fond of A&M.  Some, gosh,

1  almost 20 years ago, they called and said, would you like

2  to teach at our campus in Tuscany this summer?  I said,

3  Yes.  They said, don't you want to know what we want you to

4  teach?  No.  By summer I'll know enough to fake it.

09:24:39  5              What exactly was the malpractice of

6  Dr. Brown?

7              MR. HENSLEE:  Dr. Brown did not order any kind

8  of tests whatever.

9              THE COURT:  Have you seen the records?

09:24:51  10             MR. HENSLEE:  I have seen everything my client

11  has given me.

12             THE COURT:  No, that's not my question.

13             MR. HENSLEE:  Yes, sir.

14             THE COURT:  You need to look at all the

09:24:59  15  records.  Clients, sometimes, and you have probably learned

16  this dealing with bureaucratic clients, don't give you the

17  good stuff.  I mean, they think it's the bad stuff, but

18  it's the stuff that we need.  So, they're going to give you

19  everything about his treatment.  And you need to measure

09:25:20  20  that against what your client gave you about it.

21             MR. HUDSON:  Just one point on that, Your

22  Honor.  Dr. Brown was not an actual employee of the A&M

23  System, and we don't have any access to the medical

24  records.

09:25:35  25             THE COURT:  Get them from him.

1           MR. HUDSON:  From Mr. Brown?

2           THE COURT:  Yes.  You're the organ grinder.  He

3  was the monkey.  Get them.  You-all sent him there.  Does

4  he still consult, or whatever?

09:25:54  5           MR. HUDSON:  It is my understanding he

6  currently lives in Lake Charles, and we haven't been in

7  contact with him.

8           THE COURT:  That's what the petition says.

9  Maybe he's working on the psychology of gambling.  But he

09:26:11  10  will give them to you.  If he won't, one line order saying

11  Dr. Brown will not cooperate, and I'll do an order for you

12  to issue a subpoena to him.

13           MR. HUDSON:  Yes, Your Honor.

14           THE COURT:  That is in Louisiana.  You will

09:26:27  15  have to go do something in Louisiana.

16           MR. HUDSON:  We will reach out to him.

17           THE COURT:  Is it true that there was a block

18  on his academic records, that he couldn't get them?

19           MR. HUDSON:  That was --

09:26:51  20           MR. GALVAN:  It was --

21           THE COURT:  That's a yes or no.

22           MR. GALVAN:  I don't know, sir.  I don't know.

23  That --

24           THE COURT:  Did you-all read this?

09:27:00  25           MR. GALVAN:  Yes, Your Honor.

1             MR. HUDSON:  Yes, sir.

2             THE COURT:  I have.

3             MR. GALVAN:  The Health Science Center was --

4    became a part of Texas A&M University.  They were merged.

09:27:10  5    And so one of the things that moved over was --

6             THE COURT:  That's the sneaky way to get into

7    the Houston market for students.

8             MR. GALVAN:  So the big university now runs all

9    the student services for the Health Science Center.

09:27:24  10           THE COURT:  I don't care who does it.  They are

11   your people.

12            MR. GALVAN:  Yes, sir.

13            THE COURT:  That's a simple factual allegation

14   that there was a block on his records and he could not get

09:27:39  15   them.  I don't know whether that's true, but should have

16   checked it before now.  You want me to go up there to

17   metropolitan Bryan and rummage around through the records?

18            MR. HUDSON:  No, Your Honor, we will take care

19   of that.

09:27:55  20           THE COURT:  I didn't think so.  I'm not sure

21   what student business services is.  Sounds like another

22   vague multiword label that -- do you know what that section

23   does?

24            MR. GALVAN:  I believe they handle all of

09:28:23  25   the --

```
 1                    THE COURT:  Speak up.
 2                    MR. GALVAN:  They handle all of the student
 3  affairs, you know, like --
 4                    THE COURT:  Student affairs?
 5                    MR. GALVAN:  -- registration.
 6                    THE COURT:  They would have been busy when I
 7  was in college.  I had a lot of affairs, in my mind mostly.
 8                    MR. GALVAN:  Scheduling, handling the records,
 9  that sort of thing.
10                    THE COURT:  You couldn't just call it student
11  records?  No.  Because the title -- you know, there is a
12  rule in the world:  The longer the title, the weaker the
13  position.  And similarly, the more complicated
14  institutional title, the less likely it is to be effective.
15  The Department of Defense does a pretty good job.  The
16  Department of Homeland Security, on the other hand, doesn't
17  know what it's doing.
18                    Have you sent him the endocrinology
19  records that you quote here?
20                    MR. HENSLEE:  No, sir.
21                    THE COURT:  Well, let's get them to them.
22                    I don't -- if this guy told him to take
23  the step one, again, when he was not a student, and that
24  was, in fact, not possible, he's a medical student.  He's
25  not in the fourth grade where somebody needs to tell him
```

09:28:29  (line 5)
09:28:47  (line 10)
09:29:15  (line 15)
09:30:12  (line 20)
09:30:45  (line 25)

1  each step.  He is supposed to know what he has to do to get

2  out.

3              Are you licensed in Texas?

4              MR. GALVAN:  Yes, sir.

09:30:59   5              THE COURT:  Did you study here?

6              MR. GALVAN:  Yes, sir.

7              THE COURT:  Do they still make you do the

8  declaration of intent to study law?  They don't know.

9  They're law students, the two --  the young ones.  The old

09:31:12  10  one is not.

11              MR. GALVAN:  They didn't.

12              THE COURT:  I actually read the book and it

13  said you had to file this declaration.  I hope they

14  cancelled it.  So it was basically, you know, your life

09:31:24  15  history and whether you had ever been -- it was a security

16  check is what it was, see if you were -- they didn't want

17  you to invest all that money in a fine education and find

18  out you couldn't be admitted to the bar because you were a

19  crook.

09:31:36  20              And so I did it.  And you would be

21  surprised about the number of my friends in their third

22  year, you're supposed to do it like within four months or

23  something, scrambling around.  They couldn't take the bar

24  until they filed that.  My favorite part -- well, there are

09:31:53  25  so many bad bar stories, but after doing that and then

1  doing the second one, when it comes around for taking the

2  bar, they clear you for all that, they wouldn't take your

3  check for the test fee.

4          Just got to love bureaucrats, don't you?

09:32:16   5          All right.  We are pretty clear that A&M

6  is part of Texas, aren't we?

7          MR. HUDSON:  That's our position, Your Honor.

8          THE COURT:  F1 on his computer is sovereign

9  immunity, sovereign immunity, sovereign immunity.

09:32:40   10          And what accommodation did Mr. Shaikh

11  apply for formally?

12          MR. HENSLEE:  He did not apply formally for the

13  accommodation under 504, or the IDEA, because he only

14  became aware of it --

09:32:59   15          THE COURT:  No, he didn't do it.

16          MR. HENSLEE:  Yes, sir.  Yes, sir.

17          THE COURT:  Step in the process that employers

18  are entitled to so they know exactly what you're claiming

19  as a disability, and they can evaluate it.  They don't have

09:33:13   20  to say, somebody since they're disabled --

21          MR. HENSLEE:  Yes, sir.  He would be --

22          THE COURT:  I had a law clerk who was disabled.

23  He was allergic to work.

24          You say any decision related to dismissal

09:33:48   25  must be careful and deliberate.  It must not be irrational.

1   If it required the governments to be reasonable, they would

2   all just have to close up shop.  It can be close, like with

3   Heynard (phonetic).

4                      Tell me the class-of-one theory.  I,

09:34:19   5   frankly, never heard of that.  What is the class-of-one

6   theory?

7                      MR. HENSLEE:  When -- just before I came to

8   this meeting, I called Marty Cirkiel, who drafted the --

9   who drafted this to ask him that very question.  He's

09:34:33   10  arguing before the Fifth Circuit this morning, and --

11                     THE COURT:  Well, good for them.

12                     MR. HENSLEE:  Yes.

13                     THE COURT:  But what is it?

14                     MR. HENSLEE:  I do not know.

09:34:49   15                     THE COURT:  It makes no sense.  I know

16  something about the Constitution.  One is clearly not a

17  class, just like one can't be a conspiracy, and all those

18  other things, it just -- I had a person the other day who

19  was an estate and a person, but whichever entity you picked

09:35:15   20  on, he would switch to the other one.  It made no sense.

21  So don't even try.  It will hurt your brain.  It's one of

22  those tax terrorists ploys where American money is not real

23  money except when they want it, you know, in the petition

24  they wanted American dollars, but they said that their

09:35:42   25  obligation to pay in American dollars wasn't real because

1  it is not real money.

2          In drafting these he doesn't do his

3  clients any favor by endlessly repeating not operative

4  facts, but minutia, and he's got medical negligence,

09:36:18  5  common-law negligence, gross negligence.  What's wrong with

6  negligence?  Medical negligence is just negligence.  The

7  question is the standard you apply.  You apply the care of

8  a professional livery stable for horses higher than you do

9  the little old lady down the street where you board your

09:36:42  10  horse.  We don't have a horse negligence.

11          These damages go on for a page, and at

12  this point the plaintiff knows how much his tuition and

13  expenses that he wants reimbursed are.  You can just hint

14  about that.  And he wants a million dollars just for the

09:37:22  15  violation of his constitutional rights.

16          You know, that might be a better system,

17  but you actually have to have damages to be compensated for

18  them.  And there is no such thing as a legal theory of

19  injunctive relief.  There is no cause of action.  It has to

09:37:43  20  be attendant to something.

21          So we have got 81, 83, disability, medical

22  malpractice, and on that one, has -- have you done all the

23  prerequisites under Texas law for medical malpractice which

24  I don't know, but --

09:38:10  25          MR. HENSLEE:  I -- I believe that we have.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          THE COURT:  He says he hasn't gotten all the

2  notices and stuff.

3          MR. HUDSON:  We haven't received anything

4  pursuant to Chapter 74 of the Texas Civil Practice.

09:38:22  5          THE COURT:  Speak up.  Are you catching it from

6  him?

7          MR. HUDSON:  I think so, Your Honor, it spreads

8  from College Station over to Austin quite often.

9          We haven't received any notice pursuant to

09:38:32  10  Civil Practice and Remedies Code Chapter 74.

11          THE COURT:  And does that include the medical

12  report?

13          MR. HUDSON:  That would include the initial

14  report, yes, Your Honor.

09:38:45  15          THE COURT:  And I didn't go back and read the

16  first complaint.  I thought this was plenty bad enough.

17          Just a lot of fluff in there, and I

18  couldn't tell by reading it, the way the facts are just

19  jumbled, and there is lots of trivia and lots of insults.

09:39:17  20          Once you identify Brown as an agent of

21  A&M, you don't have to say TAMU Dr. Brown every time you

22  say it.  Like there is only one Brown in there.  Wouldn't

23  even call him Dr. Brown.  Just I use surnames for everybody

24  and that way everybody's feelings are hurt.

09:39:37  25          And have you read this motion to dismiss?

1            MR. HENSLEE:  Yes, I have read it.

2  Mr. Cirkiel --

3            THE COURT:  It's F2.  It is not F1.

4            MR. HENSLEE:  Yes.  Mr. Cirkiel is actually

09:39:53  5  handling the response to the subsequent motion that we

6  filed based on our amended pleading, I assume.

7            THE COURT:  Is there an amended motion to

8  dismiss?

9            MR. HUDSON:  There will be, Your Honor.  The

09:40:06  10  Court granted, as you know, the motion for leave to amend

11  the complaint.

12            THE COURT:  Doesn't all these things still

13  apply to that complaint?

14            MR. HUDSON:  Well, we haven't responded to the

09:40:17  15  medical malpractice claim.  We also haven't responded to

16  the class-of-one theory.

17            THE COURT:  How are you going to look that up?

18  Go on Bing and just type in "class of one" and see what it

19  says?  I don't -- believe me, I don't know everything about

09:40:32  20  the law, but I think I would have noticed a constitutional

21  provision like that.

22            MR. HUDSON:  Well, I am certainly not going to

23  argue with the Court, if the Court is not interested in

24  carrying on with that theory.

09:40:43  25            THE COURT:  It is not a theory because it is

1    not factually explained about how he's a class of one, and
2    he has got plenty of law in there that doesn't belong
3    there, but at least he could give us a hint what this legal
4    theory -- he is one.  But a class?  He may have class, but
09:41:08   5    he's not a class.  So, I --
6              You may file a response, a motion to
7    dismiss to the amended one, or you can file a supplemental
8    one just on the medical malpractice, depending entirely on
9    what you think is in the best interest of your client.
09:41:37  10              MR. HUDSON:  Is there a preference that the
11   Court would have as to how to handle that?
12              THE COURT:  The fewer words from you the better
13   would be my general rule.
14              MR. HUDSON:  Yes, Your Honor.  I have read the
09:41:45  15   Court's standard motion.
16              THE COURT:  I have studied that, because I
17   don't know what they are going -- but if you're comfortable
18   with this on the original claims, you just want to add the
19   doctor, just if you thought better of it, if he has finally
09:42:03  20   told you some stuff that helps you, then, you decide.  You
21   don't have to decide right now.
22              MR. HUDSON:  Yes, Your Honor.  Thank you.
23              THE COURT:  When can you do it?
24              MR. HUDSON:  It's my understanding that we had
09:42:13  25   14 days from the grant of the motion for leave.  I can get

1  it done by the end of next week, Your Honor.

2            THE COURT:  I don't know why I gave you that

3  much time.

4               So the end of next week is the 17th.

09:42:33  5            MR. HUDSON:  Yes, Your Honor.

6            THE COURT:  And can you reply on the 24th?

7            MR. HENSLEE:  Yes, sir.

8            THE COURT:  Has there been any conversations

9  with the other lawyer, Mr. Cirkiel?

09:43:03  10            MR. HUDSON:  I have spoken to Mr. Cirkiel.  I

11  have also spoken to -- I don't want to butcher her last

12  name.

13            MR. HENSLEE:  Odediran.

14            MR. HUDSON:  -- Ms. Odediran.  I have spoken

09:43:17  15  with both of them.  But, yes, Your Honor, I have spoken

16  with both of them.

17            THE COURT:  Any progress?

18            MR. HUDSON:  In terms of?

19            THE COURT:  I don't know.  I don't know what

09:43:32  20  your client hopes for, reasonably.

21            MR. HUDSON:  We have exchanged initial

22  disclosures at this point, Your Honor.  We would like to

23  see a ruling from the Court on the motion to dismiss to

24  figure out what claims, if any, will remain after the

09:43:46  25  Court's had a chance to consider everything.  At that

1 point, you know, we would better be able to evaluate how to

2 proceed.

3            THE COURT:  Well, after I rule -- I don't, of

4 course, have any idea what I am going to rule, but then we

09:44:04   5 are going to really get busy quickly.  We are going to move

6 this along.  I don't know whether you have noticed this,

7 but cases don't get better the longer they sit.

8            Anything else this morning we can usefully

9 do?

09:44:26  10            MR. HUDSON:  Not from us, Your Honor.

11            MR. HENSLEE:  Not from us, Your Honor.

12            THE COURT:  Is there anything he forgot to say

13 that you thought he should say?

14            MR. GALVAN:  No, Your Honor.

09:44:39  15            THE COURT:  Okay.  Produce that stuff I told

16 you.

17            MR. HUDSON:  Yes, Your Honor.

18            THE COURT:  And if in the process you come by

19 something similar, give it to him.

09:44:53  20            MR. HUDSON:  Yes, Your Honor.  Thank you.

21            THE COURT:  Going to figure it out at some

22 point.

23            (Concluded at 9:44 a.m.)

24

25

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1          COURT REPORTER'S CERTIFICATE

2

3      I, Kathleen K. Miller, certify that the foregoing is a

4  correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7                          /s/_____

8  DATE:  June 24, 2016       Kathleen K. Miller, RPR, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25