1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                        HOUSTON DIVISION

3    DANYAL SHAIKH                .  C.A. NO. H-16-591
                                  .  HOUSTON, TEXAS
4    VS.                          .
                                  .
5    TEXAS A&M UNIVERSITY COLLEGE .  JUNE 27, 2019
     of MEDICINE, et al           .  10:11 A.M. to 11:22 A.M.
6

7
                        TRANSCRIPT of CONFERENCE
8               BEFORE THE HONORABLE LYNN N. HUGHES
                    UNITED STATES DISTRICT JUDGE
9

10
     APPEARANCES:
11
     FOR THE PLAINTIFF:               MS. HOLLY G. TERRELL
12                                     Cirkiel & Associates, P.C.
                                       1901 E Palm Velley Blvd
13                                     Round Rock, Texas  78664

14

15   FOR THE DEFENDANTS:              MS. EMILY LAURA ARDOLINO
                                       Texas Attorney General
16                                     300 West 15th Street
                                       Floor 11
17                                     Austin, Texas  78701

18

19   ALSO PRESENT:                    MR. TOM SILVER

20

21   OFFICIAL COURT REPORTER:        MS. KATHY L. METZGER
                                       U.S. Courthouse
22                                     515 Rusk
                                       Room 8004
23                                     Houston, Texas  77002
                                       713-250-5208
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

```
                        P R O C E E D I N G S

             THE COURT:  Thank you.  Please, be seated.

                  Good morning.

             MR. SILVER:  Good morning.

             THE COURT:  I don't have the whole docket sheet.
Ms. Terrell, who do you represent?

             MS. TERRELL:  The plaintiff, Mr. Shaikh.

             THE COURT:  Say his name again.

             MS. TERRELL:  Danyal Shaikh.

             THE COURT:  Shaikh?

             MS. TERRELL:  Yes, Your Honor.

             THE COURT:  And you represent A and he represents M?

             MS. ARDOLINO:  Something like that I am counsel of
record, Emily Ardolino for A&M College of Medicine.  And Tom
Silver is counsel for A&M.

             MR. SILVER:  I'm in-house at the --

             THE COURT:  Pardon?

             MR. SILVER:  I'm in-house at the Texas A&M University,
also, Your Honor.

             THE COURT:  Good.  I mean that they keep him in-house
where he can do very little damage.

                  Has there ever been a question in this case that
the Acts relied on don't apply to A&M?

             MS. ARDOLINO:  Are you asking whether that we have Act
advised A&M, whether we've ever contended that it does not?
```

10:12:48   1        *THE COURT:*  No.  Well, yes.  One proposition is that

2    A&M has funded some of its programs with aid from the people of

3    America, not just the people, the victims of Texas.

4        *MS. ARDOLINO:*  That's correct.  I believe that it's

10:13:14   5    not a question that A&M has received federal funds.

6        *THE COURT:*  I didn't recall.  Why did you bring that

7    up, Ms. Terrell?  In some of the response papers, there's a --

8    Mr. Shaikh brings up they get federal funds.  That's not the

9    issue.  The issue is whether he was otherwise qualified.

10:13:50  10        *MS. ARDOLINO:*  That's correct.  That's at least one of

11   the issues.

12        *THE COURT:*  Okay.  What's another one?

13        *MS. ARDOLINO:*  Whether the disability was the cause of

14   or let alone the sole cause of his withdrawal or his -- A&M's

10:14:19  15   refusal to readmit him.

16        *THE COURT:*  A&M's declining to readmit him was, in

17   fact, motivated by the other thing is his disability?

18        *MS. ARDOLINO:*  Well, we're contending that it was not

19   motivated by --

10:14:40  20        *THE COURT:*  Well, I know that.  I'm just trying to get

21   the issues.

22        *MS. ARDOLINO:*  Understood.  But to the extent that

23   there is some sort of fact issue on whether it was one

24   motivating factor, there is -- it was not the sole cause,

10:14:54  25   because there were other factors as well.

10:14:58  1          THE COURT:  Right.  And so are we dealing with

2     anything except the Rehabilitation Act?

3          MS. ARDOLINO:  No.  That was the only claim that was

4     remanded by the Circuit.

10:15:15  5          THE COURT:  And how are the standards for the

6     Rehabilitation Act, Ms. Terrell, different from the ones for

7     employment discrimination?

8          MS. TERRELL:  Under the --

9          THE COURT REPORTER:  Can she move closer to the mic?

10:15:34 10          THE COURT:  Ma'am, you're going to have to move -- use

11    this one.

12          MS. TERRELL:  This one?

13          THE COURT:  Because you'll have to lean over to do

14    that one and then your back will go out.

10:15:41 15          MS. TERRELL:  The Rehabilitation Act is based on

16    protections offered or guaranteed to people with disabilities

17    like Mr. Shaikh, whereas employment discrimination would be for

18    other things.  And this is a -- also, it's a school.  So they

19    receive federal funds.

10:16:04 20          THE COURT:  There's no question.  Quit bringing that

21    up.  I kept saying, where did that come from.

22               So does the Act require A&M to rehabilitate him?

23    Tell me how it applies.

24          MS. TERRELL:  The Act prohibits A&M from

10:16:34 25    discriminating against Mr. Shaikh or any other -- a person with

10:16:37  1  a disability based upon their disability.

2        *THE COURT:*  So it's just we're back to the fundamental

3  disability claim, like employment, but he's -- is somebody

4  moving into that class of doctor, student employed, or does he

10:17:05  5  just has to pay you?

6        *MS. ARDOLINO:*  He was just a student.  I don't believe

7  that he was an employee.

8        *THE COURT:*  Okay.

9        *MS. ARDOLINO:*  His claim was actually brought

10:17:16  10  originally under Title II of the ADA as well as the Rehab Act.

11  That Title II claim was dismissed by the Fifth Circuit.  We're

12  only under the Rehab Act.  And the only practical difference in

13  terms of the elements of the claims between the Title II, ADA

14  claim and the Rehab Act claim is the sole causation standard in

10:17:39  15  the Rehab Act.  But the other elements, the qualified to do

16  the -- you know, the --

17        *THE COURT:*  And does he have to be actively engaged in

18  rehabilitation?

19        *MS. ARDOLINO:*  He has to be disabled or at least

10:17:56  20  perceived as disabled.  And he has to -- but he also has to be

21  able to perform the essential -- or otherwise qualified is what

22  it's called under Title II, which basically means that with or

23  without an accommodation, he was qualified to do --

24        *THE COURT:*  If he has to be disabled and he lost on

10:18:17  25  the disability claim, isn't that issue precluded?

10:18:22   1        *MS. ARDOLINO:*  We don't actually think that the

2  outstanding issue is whether or not he was disabled or

3  perceived as disabled, although I think there is a question as

4  to that.  The real, I think, issue is whether or not he was

10:18:42   5  actually qualified to remain in the medical school program; and

6  because of his inability to pass and then retake the Step 1

7  exam, he was not otherwise qualified to remain in that program.

8        *THE COURT:*  It's been a while.  But do I understand

9  correctly that at the end of two years, they took a step exam

10:19:11  10  or a progress exam, and then he did not pass it?

11        *MS. ARDOLINO:*  That's exactly right.  I believe that

12  the trajectory was while he was enrolled at the end of his

13  second year, that's when medical students will take the Step 1

14  exam.  It's the first in a series of licensing exams that are

10:19:32  15  required for entry into the medical profession.  Texas A&M

16  requires passage of the Step 1 exam in order to continue with

17  the program.

18        So when he took it and failed it the first time,

19  Texas A&M allowed him to take a leave of absence, during which

10:19:52  20  he had an opportunity to study.  So he was rescheduled to take

21  the exam at least once and I believe twice during the next

22  year, and both of those times he declined to take the exam.  So

23  finally at the end of almost a year, I believe, of absence, the

24  College of Medicine decided that it could no longer keep him in

10:20:16  25  the program because of his inability to take and pass the Step

10:20:20   1   1 exam.

2          THE COURT:  Well, you're holding a space?

3          MS. ARDOLINO:  No.  He -- for that year when he was on

4   leave, yes, that's correct.  He was still enrolled in the

10:20:33   5   program.  They made him the accommodation, so to speak,

6   although not necessarily for a disability, but they attempted

7   to keep him in the program by allowing him time to study and

8   prepare for this exam and take and pass this exam as is

9   required before he can continue his studies.  But at the end of

10:20:55   10   the year when he had failed to do so, the --

11          THE COURT:  Well, he failed to do so.  He took the

12   test once?

13          MS. ARDOLINO:  That's correct.

14          THE COURT:  Failed it?

10:21:06   15          MS. ARDOLINO:  Yes.

16          THE COURT:  Had a second opportunity to take the test

17   on his leave of absence and he did not take the test?

18          MS. ARDOLINO:  That's correct.

19          THE COURT:  And he was given a third opportunity take

10:21:19   20   the test while on leave of absence and he did not take the

21   test?

22          MS. ARDOLINO:  I believe that is also correct.

23          THE COURT:  But he failed -- you said something about

24   passing it and failed to do so.  Of course, you always fail if

10:21:33   25   you don't take it.

10:21:34  1          *MS. ARDOLINO:*  That's correct.

2          *THE COURT:*  I take that back.  Seeing the standards in

3  some colleges today, that may not be as strong a rule as I

4  thought it was.

10:21:50  5                  So, Ms. Terrell, he has to take the test.  That's

6  a mutual rule, right?

7          *MS. TERRELL:*  Yes, Your Honor.

8          *THE COURT:*  And he took it once and didn't.  They kept

9  him in the program and allowed him to take it on two more

10:22:12  10  occasions before they said, We're giving up.  The disability is

11  not failing to pass the exam or failing the exam.  His

12  disability is some -- I forget what they finally figured out it

13  was.  Were you the lawyer when he sued all these people?

14          *MS. TERRELL:*  No, Your Honor, I was not the attorney

10:22:46  15  when the initial claim or complaint was filed.  I came on

16  later.  In response to --

17          *THE COURT:*  He sued everybody who A&M sent to help

18  him.  So explain to me how his disability as a stigma as

19  opposed to a fact was used by A&M in evaluating his

10:23:29  20  qualifications for continuing the program.

21          *MS. TERRELL:*  Yes, Your Honor.  A&M was well-aware

22  that Mr. Shaikh was having issues.

23          *THE COURT:*  No, ma'am.  That's all settled.  I just

24  said that.

10:23:47  25          *MS. TERRELL:*  And --

10:23:48   1    THE COURT:  He went to A&M.  A&M did a lot to try to

2    help him.  He didn't like it.  It's everybody's fault but his.

3    He took the test and failed it.  He didn't take it when A&M

4    offered him the opportunity while keeping him registered.  Is

10:24:10   5    that the correct term?

6    MS. ARDOLINO:  Right.  He was -- he continued to

7    remain enrolled.

8    THE COURT:  So there's nothing subjective on the part

9    of A&M's officers about his qualifications.  He did not take

10:24:27  10    the test, much less pass it.

11    MS. TERRELL:  Yes, Your Honor.  That's correct.  He

12    didn't take the test.  And the reason he -- his disability is

13    directly linked to the fact that he was both unable to pass the

14    test and unable to take it again during the period of time --

10:24:43  15    THE COURT:  Why was he unable?

16    MS. TERRELL:  He was seeking treatment for his

17    disability.  And once he --

18    THE COURT:  What is the disability?  You say it's

19    linked to all this stuff.

10:24:55  20    MS. TERRELL:  I can't recall the exact name, but it's

21    an anxiety disability that has something to do with a hormone

22    in his body.

23    THE COURT:  And its symptoms are inability to

24    concentrate?

10:25:10  25    MS. TERRELL:  Yes, Your Honor.  A lot of symptoms,

10:25:11   1   including that and anxiety and, of course, it's directly linked
2   to his test-taking abilities.
3        THE COURT:  So it's not as if he has been healed?
4        MS. TERRELL:  He still has a disability, but he is
10:25:25   5   being treated, so he is able --
6        THE COURT:  Ma'am, he is not healed from what he
7   claims made it impossible for him to pass the test?
8        MS. TERRELL:  No.  However, he is -- he has figured
9   out, with the help of medical professionals, what the issue is
10:25:44   10   and is being treated so that he is able to take the test and go
11   to medical school.
12        THE COURT:  Why did he not take the test?
13        MS. TERRELL:  Originally because he was still in the
14   process of seeking treatment.
10:25:58   15        THE COURT:  So as long as he doesn't feel up to it, he
16   has a disability and can't take it and they have to let him go.
17   Do you have a medical report from a physician that says that at
18   no time in the last -- was it a year it was left open for him?
19        MS. ARDOLINO:  It was -- it was approximate --
10:26:23   20   actually a little bit over a year from the time -- or, no, I'm
21   sorry.  Just short -- just shy of a year from the time that he
22   first failed to the time that he ultimately withdrew.
23        THE COURT:  Does he have a letter from the doctor back
24   then saying, Don't take the test.  It will stress you too much?
10:26:46   25        MS. TERRELL:  I'm not aware of any letter that

specifically states as much.  I'm sure that when we designate

experts, we'll --

THE COURT:  No.  I want contemporaneous.  He's seeing

the doctor for a while at A&M's expense, right?  Y'all paid for

the psychiatrist, Mr. Silver?

MS. ARDOLINO:  Tom may be able to speak to how this

program works.

MR. SILVER:  Your Honor, all students at the medical

school had the ability to say, Hey, I'm, you know, having

stress and I'm not being able to, you know, deal with medical

school and they get up to six visits with a counselor or

whoever at the school's expense.  The school pays for it.  They

don't -- they give them a list of people they can go see.  The

school doesn't know who they go see.  It doesn't get the

records.  It's all -- it's just available to any student who is

going through some kind of, you know, stressful situation, be

it school related or outside of school related.

THE COURT:  Has Mr. Shaikh furnished the University

with those records?

MS. TERRELL:  Mr. Shaikh has furnished the University

with all the records that are in his possession.

THE COURT:  No, ma'am.  They're his records.  He needs

to get them and give them to A&M.

MS. TERRELL:  Understood, Your Honor.

THE COURT:  They're his records.  That's like some

10:28:28 1  businessman, occasionally they'll tell me, Oh, I don't have

2  those records.  Well, where are they?  They're at my

3  accountant's.  Go get them.  Doctors are just one of the

4  technicians you hire to get through life.  They probably

10:28:46 5  wouldn't like me putting it that way, but -- all right.

6  Get closer to the microphone.

7  MS. TERRELL:  Yes.

8  THE COURT:  You all are speaking softly.  And when you

9  all don't speak up, she hurts me when we take a recess.

10:29:16 10  So it is the case that -- has anybody at A&M's

11  Medical School been allowed a year to retake the test and not

12  known it and then come back later and say, Okay.  I'm okay now,

13  and do it?

14  MS. ARDOLINO:  Mr. Shaikh is the only person at least

10:29:55 15  going back ten and probably more years in the collective memory

16  of A&M's Medical School administration of any student

17  withdrawing for failure to take or pass the Step 1 exam and

18  then reapplying for admission.

19  THE COURT:  So, I forgot that.  That reminds me.  So

10:30:18 20  we have a failure and two no-shows and then a withdrawal?

21  MS. ARDOLINO:  That's correct.

22  THE COURT:  Is that right?

23  MS. TERRELL:  That is my understanding.

24  THE COURT:  Well, that's what the records say, and I

10:30:33 25  don't recall him ever having contested that.  So A&M -- now,

10:30:43   1    has he applied for readmission?

2              MS. ARDOLINO:  He applied for readmission for the

3    school year 2015 and the school year 2016.  But both times he

4    was deemed a not competitive applicant and so he was denied

10:30:59   5    admission.

6              THE COURT:  All right.  So after he withdrew, he

7    reapplied?

8              MS. ARDOLINO:  He did.

9              THE COURT:  And there were more highly qualified

10:31:12  10    students to fill the available slots?

11             MS. ARDOLINO:  That's correct.

12             THE COURT:  And where would he enter were he to enter

13    again?

14             MS. ARDOLINO:  I think that that determination was not

10:31:26  15    made at the time that they considered him for admission.  It

16    is -- so we can really only speculate, because the way that it

17    would have worked is he would have applied for admission and

18    had he been admitted, a committee would have decided whether he

19    got to reenter in his third year where he left off or whether

10:31:49  20    he would have to restart from the beginning or what, what it

21    would be, and they never got to that point because they did not

22    grant him admission.

23             THE COURT:  And it's not possible after a year or so

24    to say, Okay.  Now I'm ready to take the test and go back to

10:32:13  25    the original problem?

10:32:16  1          MS. ARDOLINO:  Well, he would -- in order to -- if he

2  had been accepted for readmission, he would have had to take

3  the Step 1 exam either if he had been entering as if he were a

4  brand-new medical student, he would have gone through his two

10:32:33  5  years and then had to take the exam just like he did the first

6  time --

7          THE COURT:  Hopefully not.  Better.

8          MS. ARDOLINO:  Hopefully he would have passed.  And

9  so, but, yes, that always would be a requirement to take and to

10:32:49  10  pass the Step 1 exam.

11          THE COURT:  But I think what you told me is the school

12  doesn't necessarily reinstate them the day before the test that

13  they flunk.  They reinstate them wherever they think they're

14  current -- well, as I understand, he went somewhere else.

10:33:13  15          MS. TERRELL:  Yes, Your Honor.

16          THE COURT:  Where did he go?

17          MS. TERRELL:  To a medical school in the Caribbean.

18          THE COURT:  Did he graduate?

19          MS. TERRELL:  Not yet.

10:33:30  20          THE COURT:  Do they have his records at that school?

21          MS. TERRELL:  I don't believe that it does and the

22  reason --

23          THE COURT REPORTER:  Can she get closer to a --

24          THE COURT:  All right.

10:33:42  25          MS. TERRELL:  I am currently --

10:33:44   1          THE COURT:  Get closer.  Tammy Wynette doesn't sing
         2   from 2 yards behind the mic.
         3          MS. TERRELL:  There was a miscommunication, and I'm
         4   currently working with my client to get all the records that I
10:33:54   5   can from the new medical school.
         6          THE COURT:  Get all the records.
         7          MS. TERRELL:  Yes, Your Honor.  We are going to get
         8   all the records.
         9          THE COURT:  As he goes through that school, they hand
10:34:09  10   him copies of lots of records.  And he's old enough at this
        11   point not to do what most undergraduates do and just throw away
        12   all that stuff from the dean's office.  But he needs
        13   immediately to get the entire record of his application,
        14   admission and progress and whatever else is in there.
10:34:54  15          And what evidence does Mr. Shaikh have that --
        16   did the Court of Appeals talk about the difference between not
        17   continuing him as a student?  Well, that was his choice though.
        18   So the real question is the reapplication rejections, right?
        19   That's all that's left.  So he has to have -- we know that he
10:35:24  20   was not accepted in '15 and '16, right?
        21          MS. TERRELL:  Yes, Your Honor.
        22          THE COURT:  What does he know besides the fact that he
        23   was not admitted and he has -- I don't know how you have a
        24   rehabilitation, but he has a problem that is addressed by the
10:35:53  25   Rehabilitation Act, that it was because of it?

10:36:00   1          *MS. TERRELL:*  He was told by a faculty or staff member

2    at Texas A&M that he was a psychological risk.

3          *THE COURT:*  Well, that apparently is true, isn't it?

4          *MS. TERRELL:*  Due to his disability, he --

10:36:13   5          *THE COURT:*  Ma'am, no.  He has an intellectually

6    functional disability.  It may be his liver that's doing it.

7    But taking tests or retaining the knowledge he learned -- you

8    know, there are conditions that you can learn everything this

9    morning and you'll forget it all by this afternoon.

10:36:50  10          So that's -- no matter how bright you are, that's

11   a problem with your being a doctor and doing what you need to

12   do to get to be a doctor.  And he doesn't know whether it was

13   faculty or staff?  Does he know what their name was or its

14   name?

10:37:10  15          *MS. TERRELL:*  Yes.  I have their name.  I can find it.

16          *THE COURT:*  Do you know who -- about this?  I don't

17   remember it, but --

18          *MS. ARDOLINO:*  I don't -- I don't know that any -- I

19   think that's an allegation.  I don't know that that is in

10:37:24  20   evidence.  So I'm not -- I think that fact would be disputed as

21   it was recited.  I think there is one -- one kind of

22   distinction here is that in terms of what A&M knew about any of

23   Shaikh's alleged abilities -- disabilities, it was basically

24   what A&M knew up until -- at least up until his second

10:37:54  25   reapplication for the 2016 educational year was that he was

10:38:00  1   having issues with anxiety related to his -- some family

       2   issues, namely, his parent's divorce.

       3            So I think there is a question as to whether or

       4   not A&M even knew about any disability or attributed any of

10:38:16  5   this to a disability.  So there is a question I think on intent

       6   and just general knowledge.  I think that by the time that he

       7   was reapplying in -- for the 2016 school year, he had revealed

       8   that he had this pituitary tumor diagnosis, which he was

       9   claiming caused his inability to take the exam.  However, that

10:38:42  10  diagnosis did not play any role in the University's decision

       11  not to readmit him.

       12           *THE COURT:*  So Mr. Shaikh -- does the school admit the

       13  reason he's having problems is the pituitary tumor?

       14           *MS. ARDOLINO:*  Again, not until his second relapse.

10:39:09  15           *THE COURT:*  Right.  For '16?

       16           *MS. ARDOLINO:*  That's correct.

       17           *THE COURT:*  And did he -- and some of this stuff I may

       18  have read earlier, and I simply don't remember.  Did he have a

       19  letter from a doctor explaining how this pituitary tumor

10:39:30  20  affected his memory facility at recalling what -- I don't know,

       21  whatever it is that was his problem?

       22           *MS. ARDOLINO:*  I don't know the answer to whether or

       23  not he submitted any kind of letter from a doctor as part of

       24  his 2016 application.

10:39:52  25           *THE COURT:*  Do you?

10:39:54   1          *MR. SILVER:*  Your Honor, I know that from my
2      recollection of the application, he mentioned in there --
3          *THE COURT REPORTER:*  Microphone.
4          *MR. SILVER:*  -- and in his interviews that --
10:40:03   5          *THE COURT:*  You've got do like this (indicating).
6          *MR. SILVER:*  Okay.  He mentioned in his interviews in
7      the 2016, that, oh, I finally found out what was wrong with me
8      about, you know, my test taking anxiety.  I had this pituitary,
9      you know, tumor, and that's why I was having that problem.
10:40:21  10          And I don't think that he attached any medical
11     record to his application, but he made it known that that was
12     something that had -- that he had found the answer to in this
13     2016 application and interview process.
14          So, if I might --
10:40:43  15          *THE COURT:*  Sure.
16          *MR. SILVER:*  -- one of the things that we have been
17     told and what the Court has been told in this case is that
18     Mr. Shaikh is currently in medical school in the Caribbean.
19     Yet in the documents that we were provided recently, it shows
10:41:01  20     that he has made an application to a perfusionist school at the
21     Heart Institute here in Houston.  And they provided us his
22     application.  And it says the last place that he went to school
23     is at Texas A&M University School of Medicine.  It doesn't say
24     anything about any Caribbean medical school.  We've not been
10:41:25  25     provided any documents to establish that he's in some Caribbean

10:41:29  1  medical school and --

2          THE COURT:  Is it Granada that has the medical school?

3          MS. ARDOLINO:  I don't know the answer to your

4  question, but that does segue into, you know, after our last

10:41:46  5  conference --

6          THE COURT:  Well, you're a lawyer.  You can make

7  anything segue.  Now, here's what --

8          MS. ARDOLINO:  He did a way better job at it than I

9  did though.  But after -- following our last conference in

10:41:58  10  April, this Court issued an order for the parties to exchange

11  certain documents and information and for A&M to file certain

12  things, which we did.  Since we had an opportunity to review

13  the documents that were provided to us by the plaintiff and we

14  have alerted opposing counsel to certain deficiencies in those

10:42:17  15  documents, including that we are uncertain that we've received

16  all of his medical records, as we discussed before, we have

17  received no current records from his medical school and nor

18  have we received any documents indicating that he is or has at

19  any point in time since his withdrawal from A&M been in a

10:42:40  20  medical school, which is contrary to, I think, what we had

21  understood.

22          And we are -- we also have not received, with the

23  exception of a recent application that Mr. Silver just

24  mentioned to the perfusion school in Houston, we have not

10:43:00  25  received any of his applications or acceptance or denial

10:43:04  1    letters from any other medical schools that he has applied to.

2              THE COURT:  Or any other school?

3              MS. ARDOLINO:  Or any other school with the exception

4    of this perfusion school that we --

10:43:15  5              THE COURT:  But it doesn't have to be a medical

6    school.

7              MS. ARDOLINO:  Well, it doesn't necessarily have to be

8    a medical school, although, you know, in order -- one of the

9    elements of Mr. Shaikh's damages is he is claiming that his

10:43:28  10   ability to pursue his career in the medical profession has been

11   impeded by Texas A&M's actions.  And he has conceded that he

12   can apply to other medical schools, but right now we don't have

13   any evidence that he is even attempted to do so.  So --

14             THE COURT:  Okay.  I got the idea.

10:43:53  15             MS. ARDOLINO:  Yeah.

16             THE COURT:  Ms. Terrell, when did you join this case?

17             MS. TERRELL:  I joined this case, I think it was

18   probably the first of this year, I might have filed my notice

19   of appearance.

10:44:07  20             THE COURT:  Okay.

21             MS. TERRELL:  It was a few hearings ago.

22             THE COURT:  Okay.  So this is not personal.  But

23   Mr. Shaikh brought this claim in July of 2016.  If we wait just

24   three days, it will be July '19.  And all the stuff was asked

10:44:32  25   for.  The first thing I do is try to figure out what the facts

10:44:37  1   are.   Lawyers want to talk about law.   You don't know what law

      2   applies till you know what happened.   And so all the records

      3   that Mr. Shaikh has of alternative employment applications as

      4   well as acceptances, all his medical records or all -- any

10:45:01  5   other school, medical or otherwise, to which he has gone, get

      6   them his Social Security records -- every time you file a tax

      7   return, the IRS gives the information to Social Security so

      8   they can calculate how much money to give you if you live long

      9   enough.

10:45:26 10            So all those things should have been done about

     11   three years ago.   I don't recall having seen any post-A&M data,

     12   like names of schools.   And you said earlier, you don't have

     13   them, which means Mr. Shaikh has done nothing to substantiate

     14   his claim about describing how the Grenada School of Medicine

10:46:01 15   has accepted him and what he's been allowed to do, showing that

     16   A&M should have to, or whatever.   But they're entitled to see

     17   these things.

     18            Did you know about the phlebotomist or whatever

     19   it is he's doing?

10:46:18 20            MS. ARDOLINO:   I'm sorry?   The phlebotomist?

     21            MS. TERRELL:   Perfusionist school.

     22            MR. SILVER:   Oh, perfusionist.

     23            THE COURT:   What is that?

     24            MR. SILVER:   I had to look it up.   It's something

10:46:30 25   about -- it's in the medical field.   It's like a nurse or

10:46:34   1   something.  You help, you know, in a heart procedure or

           2   something.  You are trying to help during the procedure with,

           3   you know, blood functioning, and so -- and that if somebody is

           4   in medical school and we were told that he was doing well in

10:46:53   5   this Caribbean medical school, then why in the world is he

           6   applying to the school of perfusionists at the Heart Institute

           7   here in Houston for admittance in July of this year?  It makes

           8   zero sense.

           9              And, Your Honor, if I might, you know, I went and

10:47:12  10   I looked at the pretrial conference that was held in your

          11   office before I got in this case.

          12              *THE COURT:*  The good old days.

          13              *MR. SILVER:*  Yes.  And one of the things that you

          14   ordered during that, in the transcript, you told them give him

10:47:26  15   all of Mr. Shaikh's medical records.  And that's got to be two

          16   years ago.  And although we have names of -- that they provided

          17   names of people and no records, not even the addresses of these

          18   doctors that he has allegedly seen.

          19              And the other thing, you know, we are relying on

10:47:46  20   them to know that they're giving us the entire record from

          21   these people, which they have not done so.  And so we're in the

          22   dark about these things that should have been produced, as the

          23   Court noted and were told then to produce over two years ago.

          24   So I'm a little frustrated, as you can tell.

10:48:10  25              *MS. ARDOLINO:*  And I will add, Your Honor, that --

10:48:13  1          *THE COURT:*  That's all I do every day is try to

2  convince people that they really want to address what needs to

3  be done and deliver the documents.  The alternative thing they

4  do, Mr. Silver, is usually these are businesses that, okay,

10:48:32  5  Acme sued us.  Give him every record we have about everything.

6  And the good three pages are stuck in the middle of box hundred

7  and twenty-three.

8          That's just my last case before I went on the

9  bench and had the crankiest California security lawyers on the

10:48:56  10  other side.  And they made it -- their client invested in this

11  company that held a license from my client for a chemical

12  process.  And the first day of the deposition, these lawyers

13  would photo -- would mark in the Manila file that came in

14  everything in the file.  So in a burst of late adolescence when

10:49:36  15  we went back to the office afterwards to get stuff that they

16  had asked for, I said, You know, that clipping you have of

17  their client being barred from executive positions by the SEC?

18  He said, Yeah, I still have it.  I said, Photocopy it and put

19  it in every folders the first thing.  And they dutifully marked

10:49:59  20  every -- I shouldn't have done that.

21          *MS. TERRELL:*  If I may, Your Honor?  No, I wasn't on

22  the case back in 2015, 2016.  However, I am on the case now, so

23  I do take responsibility.  And opposing counsel has mentioned

24  that he doesn't know if we will be able to get him the full set

10:50:26  25  of medical records.  I was under the impression we were

10:50:28  1  supposed to produce what we had.  I'm generally accustomed to

2  opposing counsel requesting their own set of records.  We are

3  willing to either request them ourselves and hand them over or

4  we can sign a waiver and they can request the records so that

10:50:42  5  they know they have the entirety if that --

6        THE COURT:  Well, the choice is up to you.

7        MS. ARDOLINO:  Well, pursuant to your Court's order,

8  the plaintiffs were -- the plaintiff was already supposed to

9  request and hand over those medical records.  I think our

10:50:58  10  request would be that he request those medical records directly

11  from his provider, along with a business record affidavit, so

12  that we don't have to call the providers in order to

13  authenticate the documents, and in compliance with the Court's

14  order.  So that's what we --

10:51:17  15        THE COURT:  Do you think he was going to object to his

16  own doctor's records?  I guess if they're bad.

17        MS. ARDOLINO:  I would hope not, but it's always

18  helpful.

19        THE COURT:  Yes, sir.

10:51:27  20        MR. SILVER:  Well, an affidavit, Your Honor, would

21  allow us to know if we have the entire record, if the custodian

22  said, I'm providing pages 1 through 99, these are all of the

23  records that I have regarding Mr. Shaikh and his treatment

24  here, instead of right now what we've been produced is like

10:51:45  25  piecemeal pages here, there, letters from doctors.

10:51:51  1                    *THE COURT:*  All right.  So do you want them to get --

2  her or him --

3                    *MS. ARDOLINO:*  Yes.

4                    *THE COURT:*  All right.  Yes, please, ma'am.

10:52:05  5                    *MS. TERRELL:*  Understood.

6                    *THE COURT:*  The medical records, if any help he's got,

7  including things not related to this.  You know, if he got hit

8  with a baseball, doing something and went to a doctor.  His

9  entire medical history since he moved to -- where is your

10:52:27  10  medical school?  In Bryan?

11                    *MS. ARDOLINO:*  College Station.  Correct?

12                    *MR. SILVER:*  College Station-Bryan, Your Honor.

13                    *THE COURT:*  Since he showed up in College Station

14  later on, if there are -- well, do you know when he started --

10:52:50  15  you don't know what his medical history was before he showed up

16  at A&M and this problem?

17                    *MS. TERRELL:*  My understanding is that he didn't have

18  any significant issues or the typical stuff that --

19                    *THE COURT:*  That's my understanding, too, but I don't

10:53:14  20  know anything.  So he's to produce a schedule of all medical

21  doctors -- how old is he?  28 or something?

22                    *MS. TERRELL:*  Yes.  And, Your Honor, we've done that.

23                    *MS. ARDOLINO:*  Your Honor, we were provided a list of

24  just names with no addresses or other information and just a

10:53:37  25  general description of what the treatment or visit was for.  So

10:53:41  1  we have that, although --

2          THE COURT:  What did you do with it?

3          MS. TERRELL:  -- certain contact information or

4  additional information has not been provided.

10:53:49  5          THE COURT:  Well, get the contact.  But that's all I

6  want them to do to start with, just say, I broke my leg in

7  third grade and --

8          MS. ARDOLINO:  So --

9          THE COURT:  Because people tell their doctors all

10:54:03  10  kinds of things.  And frequently you're seeing an orthopedist

11  and you tell him something else about another problem you have

12  and they dutifully write it down, as they should.  Then it

13  comes up later and contradicts what the doctor now says.

14          MS. ARDOLINO:  And I believe we have received a list

10:54:27  15  that plaintiff has sent us with medical doctors at least since

16  he started at A&M.  That's my understanding of what that list

17  is.

18          MS. TERRELL:  I was under -- I thought it went back

19  further than that, but I don't remember exactly when --

10:54:45  20          THE COURT:  Go back to when he started high school.

21          MS. TERRELL:  Yes, Your Honor.

22          THE COURT:  I mean, you could have problems before

23  that, but if it's going to manifest ever, teenagedom would be

24  the likely part.  Jobs and any kind of job, like medical jobs.

10:55:07  25  Schools, every school he's gone to, including his elementary

10:55:12  1   school.   We've done jobs.   Anything else?

2          MS. ARDOLINO:   The application information for --

3          THE COURT:   Well, that's jobs.   Jobs he's had, jobs

4   he's applied for.

10:55:31  5          MS. ARDOLINO:   Or medical schools, Your Honor --

6          THE COURT:   Medical -- well, that's a job.

7          MS. ARDOLINO:   -- or training schools.

8          THE COURT:   Well, I said jobs and schools.

9          MS. ARDOLINO:   Oh, okay.   Understood.

10:55:42  10          THE COURT:   Was he in the military?

11          MS. TERRELL:   No, Your Honor.

12          THE COURT:   Double-check that --

13          MS. TERRELL:   Okay.

14          THE COURT:   -- but those records are a little more

10:55:54  15   difficult to get.

16          MS. ARDOLINO:   And I will add, Your Honor, that we

17   view this case as relatively straightforward --

18          THE COURT:   So did I.

19          MS. ARDOLINO:   -- the issues on summary judgment, and

10:56:09  20   we don't necessarily view this as a very document heavy or fact

21   intensive case.   So we appreciate your efforts in trying to

22   narrow those record requests and the scope of discovery.   So --

23          THE COURT:   While the data have not been much, they

24   have been incomplete, sometimes confused, and you're picking up

10:56:35  25   some stuff that's been argued six different ways that --

10:56:39   1          MS. ARDOLINO:  Which, again, this case has been with

       2   us since 2016, and so at this point we are looking to complete

       3   discovery and so that we can get dispositive motions on file.

       4              And, again, in order to do that from our

10:57:02   5   perspective, the -- in addition to the documents that have

       6   already been ordered to be produced that are still outstanding,

       7   we would seek to depose Mr. Shaikh and then I believe we would

       8   probably at least, unless we uncover some other piece of

       9   information that we need to --

10:57:24  10          THE COURT:  Well, you need to look at the documents

      11   first.

      12          MS. ARDOLINO:  That's correct.  We would like to do

      13   that --

      14          THE COURT:  But there's no point everybody --

10:57:27  15          MS. ARDOLINO:  -- before we take his deposition.

      16          THE COURT:  -- sitting around a table while she reads

      17   documents.

      18              All right.  Anything you want from them?

      19          MS. TERRELL:  Yes, Your Honor.  I'm not -- I don't

10:57:38  20   know, because we haven't received -- absolute confirmation that

      21   we received all the educational records from Texas A&M

      22   undergrad and medical school and that was --

      23          THE COURT:  Oh, he went there to undergraduate school?

      24          MS. TERRELL:  Yes, Your Honor.

10:57:53  25          MS. ARDOLINO:  And Your Honor actually ordered us

10:57:54  1  after the last conference to produce his undergraduate records,

2  which we already had produced, and so we directed plaintiffs to

3  our prior production of those records.  I will -- I do not know

4  off the top --

10:58:08  5        THE COURT:  Okay.  What about sports and -- all the

6  records, if he was active in student government, any of those

7  kind of things that just might have a record of interest.

8        MS. ARDOLINO:  And we don't believe that there are any

9  records like that remaining from his undergraduate education at

10:58:29  10  A&M.

11        THE COURT:  And you may have some basis for that

12  belief, but I want --

13        MS. ARDOLINO:  Confirmation.

14        THE COURT:  -- something from them.  And, you know, go

10:58:39  15  around and make sure they take it all terribly seriously.

16        MS. ARDOLINO:  They do.

17        MS. TERRELL:  And, Your Honor, if I may, medical

18  school records as well, and then I would like any

19  correspondence regarding the reapplication processes between

10:58:57  20  the --

21        THE COURT:  Well, that's the medical school.

22        MS. TERRELL:  Okay.  Yes, Your Honor.

23        THE COURT:  I mean, everything that you've got that

24  has to do with this fellow.

10:59:05  25        All right.  Let's take a 12-minute break, see if

10:59:09   1  I think of something else.

2          (Recessed at 10:59 a.m.)

3              THE COURT:  Thank you.  Please, be seated.

4              I did think of one more thing.  The documents of

11:11:54   5  his parents' divorce, so we can correlate the stated cause with

6  the medical records and other records.  He needs also to

7  produce a photocopy of the insides of his passport, all the --

8  any entry and exit stamps in his passport.  If he's going to

9  school in the Caribbean, there will be records.

11:12:35  10              I don't understand why, but next Monday is July.

11  We all know July 4th is Independence Day here, but up north on

12  July 1st, they have Canada Day.  And I have Canadian relatives.

13  The grandfather, for whom I'm named, was born in Canada, but at

14  18 months or something came to America.  And then as a child,

11:13:19  15  he discovered he had been adopted by Americans from being born

16  in Canada.  The parents would say, Okay.  We're going to do

17  your birthday whatever day it was.  And he said, No.  My

18  birthday is July 4th.  It's on his employment applications as a

19  young railroad worker.  It's on his employment applications for

11:13:43  20  Standard Oil as a distributor.  He just wasn't having any of

21  that Canadian stuff.  It's a very nice place in the summer.

22              All right.  Did you think of anything else, any

23  new needs?

24              MR. SILVER:  Your Honor, in the response to -- when we

11:14:08  25  requested, their response as to these applications to other

11:14:12  1   medical schools --

2              THE COURT:  Yes, sir.

3              MR. SILVER:  -- was that, oh, those medical schools

4   didn't keep their rejection letters or acceptance letters.

11:14:24  5   Well, that doesn't really hold water with me in that if I am

6   sending applications and I get a denial or an acceptance, I

7   would have a copy of that if I was Mr. Shaikh.  And so, you

8   know, that's their excuse, that those schools don't keep --

9              THE COURT:  So those schools -- ma'am, those schools

11:14:48  10  have records.  And for all kinds of reasons you have to keep

11  records today.  Mainly because Putin is bored and he wants to

12  read all our records.  If she doesn't get them, you may

13  subpoena them.  Of course, first you need to know where he

14  applied.  And I don't know how you can be too confident with

11:15:13  15  that information.  But a list of every school, institute,

16  whatever.

17              Yes, ma'am.

18              MS. ARDOLINO:  No, Your Honor, I was just -- if you

19  had any further questions.

11:15:28  20              THE COURT:  I don't think so.  So the production of

21  the stuff that's in the parties' possession or reasonable

22  access will be delivered no later than July 31st.  The stuff

23  for third parties will be, I guess, September -- you know you

24  work for the government when your calendar has March and

11:16:43  25  September is adjacent from it.  There is a reason for it.  You

11:16:52  1  can snap it -- you can break it into, I guess, four sheets,

2  it's three months apiece, and it will hang right.  But it's

3  awkward still.  All that stuff needs to be delivered from them

4  by September 20th.  And for people who will require a subpoena,

11:17:22  5  my order will authorize you to subpoena the records from all

6  these categories of folks.  But he's got to -- there's no way

7  we can know where he applied for school or work.  So he's got

8  to do that.  And that will put us to -- he will be deposed on

9  October 16th.

11:18:04  10          And, Ms. Terrell, please, ma'am, tell him to get

11  serious.  He brought all this stuff.  If he'd furnished all

12  this information, we might could have told there was something

13  here.  But what he produced, in my judgment, and what's just

14  been reversed by the committee, only one out of twelve, so

11:18:33  15  that's not too bad, was that it needed to be relooked at.  So

16  he's had three years to do this.

17          *MS. TERRELL:*  Understood, Your Honor.  I will take

18  care of it.

19          *THE COURT:*  And, again, it's not you.

11:18:51  20          *MS. TERRELL:*  Thank you, sir.

21          *MS. ARDOLINO:*  I do have one more request, which is we

22  do not know whether plaintiff intends on designating any

23  experts in this matter.  But to the extent that he does, we

24  would --

11:19:06  25          *THE COURT:*  Let's wait until you see what the

11:19:08  1   documents say.

2   *MS. ARDOLINO:*  Sure.  And I suppose my request is

3   going to be that the Court set a deadline for it --

4   *THE COURT:*  I will.

11:19:13  5   *MS. ARDOLINO:*  -- so that we don't continue to drag

6   things out.  So, thank you.

7   *THE COURT:*  But what both of you need to know, if this

8   case were tried, you may not call those people "experts" in

9   front of the jury.  They're an engineer or a doctor or

11:19:26  10  somebody.  Expertise is a question of law for me.  Because when

11  you stand up and say the Court has certified this man as an

12  expert, no.

13  *MS. ARDOLINO:*  I appreciate that approach.

14  *THE COURT:*  I never met him, so I don't.

11:19:46  15  *MS. ARDOLINO:*  Thank you, Your Honor.

16  *THE COURT:*  Anything else?

17  *MS. TERRELL:*  Yes.  Regarding depositions, plaintiff

18  would like to take one deposition of the dean of admissions,

19  Maldonado.

11:20:03  20  *THE COURT:*  All right.  But let's get the records and

21  get his deposition first.  And whatever I said, the end of

22  September, is that where we got to?

23  *MR. SILVER:*  October 16th for plaintiff's deposition.

24  *THE COURT:*  October 16th.  That will -- we'll look at

11:20:30  25  where we are and what we know from his deposition and all the

| | | |
|---|---|---|
| 11:20:35 | 1 | records and then if you still want it, you may have it. |
| | 2 | *MS. TERRELL:*  Thank you. |
| | 3 | *THE COURT:*  But it may turn out somebody else is who |
| | 4 | you really want. |
| 11:20:46 | 5 | *MS. TERRELL:*  That is true.  Thank you, Your Honor. |
| | 6 | *THE COURT:*  Get your stuff to her. |
| | 7 | *MS. ARDOLINO:*  We will do so, Your Honor. |
| | 8 | *THE COURT:*  All right.  Anything else? |
| | 9 | *MS. TERRELL:*  (Shakes head.) |
| 11:20:56 | 10 | *THE COURT:*  Thank you, counsel.  Oh, are you in |
| | 11 | Houston? |
| | 12 | *MS. TERRELL:*  Yes, Your Honor. |
| | 13 | *THE COURT:*  Okay.  All right. |
| | 14 | *MS. ARDOLINO:*  Austin. |
| 11:21:03 | 15 | *THE COURT:*  Oh, I'm sorry. |
| | 16 | *MS. ARDOLINO:*  We travel all the time for these things |
| | 17 | so. |
| | 18 | *THE COURT:*  I know, but you go back and get |
| | 19 | reinfected.  It's real handy for me on this travel thing.  I |
| 11:21:22 | 20 | have one grandson at U.T. and one at A&M.  So I go up one way |
| | 21 | and loop back on the way back to see the other one or vice |
| | 22 | versa.  I'll minimize the travel as much as possible but -- |
| | 23 | *MS. ARDOLINO:*  I appreciate it, Your Honor. |
| | 24 | *THE COURT:*  Where do you live, what region of Houston? |
| 11:21:44 | 25 | *MS. TERRELL:*  I live in Pearland. |

11:21:46  1          *THE COURT:*  In where?

2          *MS. TERRELL:*  Pearland.

3          *THE COURT:*  Oh, Pearland.

4          *MS. TERRELL:*  Yes, Your Honor.

11:21:49  5          *THE COURT:*  So you're almost halfway to Austin.  It's

6    the wrong direction, but in distance.

7          *MS. TERRELL:*  It's far.

8          *THE COURT:*  It's far, but it was a nice small town

9    when one of us in this room was young.  You drive through

11:22:06 10    20 miles of country and come upon it and lots of farms and

11    things.

12              All right.  Thank you, counsel.

13          *MS. TERRELL:*  Thank you.

14          *MS. ARDOLINO:*  Thank you, Your Honor.

11:22:18 15      (Concluded at 11:22 a.m.)

16                          * * *

17    I certify that the foregoing is a correct transcript from the

18    record of proceedings in the above-entitled cause, to the best

19    of my ability.

20

21    /s/ *Kathy L. Metzger*                    *8-18-2019*
      Kathy L. Metzger                      Date
22    Official Court Reporter

23

24

25